1  **CANDIS MITCHELL**
California Bar No. 242797
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3  San Diego, California 92101-5008
Telephone: (619) 234-8467
4  Candis_Mitchell@fd.org

5  Attorneys for Mr. Mohamed Miloudi

6

7

8                    UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10                   **(HONORABLE LARRY A. BURNS)**

11

| | | |
|---|---|---|
| 12  UNITED STATES OF AMERICA, | ) | CASE NO.: 08CR1197-LAB |
| 13                    Plaintiff, | ) | DATE: MAY 27, 2008 |
|  | ) | TIME:   2:00 P.M. |
| 14  v. | ) | |
|  | ) | |
| 15  **MOHAMED MILOUDI**, | ) | STATEMENT OF FACTS AND |
|  | ) | MEMORANDUM OF POINTS AND |
| 16                    Defendant. | ) | AUTHORITIES IN SUPPORT OF MOTIONS |
| 17 _____ | ) | |

18                              **I.**

19                    **STATEMENT OF FACTS**

20    This motion incorporates by reference the prior statement of facts filed in this case.

21                              **II.**

22    **THE COURT SHOULD DISMISS COUNT TWO AS MULTIPLICITOUS.**

23    On April 16, 2008, an indictment was obtained charging Mr. Miloudi with a violation of 18 U.S.C.

24  § 1546 (b), Fraud and Misuse of Employment Document, and 18 U.S.C. § 1028A, Aggravated Identity

25  Theft.

26    As charged by the indictment, count two is multiplicitous because it charge the same conduct as

27  count one. The government may not charge the same offense in two or more counts without violating

28

                                                                      08CR1197-LAB

1   "fundamental due process rights of defendants." United States v. UCO Oil Co., 546 F.2d 833, 835 (9th Cir.

2   1976) ("an indictment may not charge a single offense in several counts without offending the rule against

3   multiplicity").  In doing so, "the vice would be that the punishment provided for a single offense may be

4   pyramided by a multi-count indictment." Id.  "The assumption underlying the Blockburger rule is that

5   Congress ordinarily does not intend to punish the same offense under two different statutes." Ball v. United

6   States, 470 U.S. 856, 861 (1985).

7   To survive this multiplicity challenge, § 1028A must require proof of something more than count

8   one and must require proof of different elements as well.  "The test for multiplicity — charging a single

9   offense in more than one count — is whether each separately violated statutory provision 'requires proof

10  of an additional fact which the other does not.'" United States v. McKittrick, 142 F.3d 1170, 1176 (9th Cir.

11  1998) (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)).

12  If the government alleges, as it will likely do, that § 1028A is so broad as to cover any possible

13  "means of identification of another person" (including an alien employment authorization card), § 1028A

14  would not require proof of an additional fact beyond what § 1546(b)  requires.  Under the government's

15  reading of § 1028A, the indictment would be multiplicitous because, instead of an enhanced penalty for an

16  aggravated crime, § 1028A would be a separate punishment for the same offenses charged in count one.

17  Count one of the indictment charges that Mr. Miloudi "did knowingly use an identification card,

18  namely, an alien employment authorization card in the name of Emilio Sanchez-Rivera, knowing or having

19  reason to know that said document was not issued lawfully for his use and was false."  Section 1028A

20  requires only that a person "knowingly transfer[], possess[], or use[], without lawful authority, a means of

21  identification of another person. . . . ."  18 U.S.C. § 1028A(a)(1).  The way the indictment reads, no fact

22  needs to be found in addition to the elements of § 1546.  Section 1028A merely provides an additional

23  penalty for the same offense.  The Constitution prohibits such multiplicitous charges.  See UCO Oil Co.,

24  546 F.2d at 835.  Thus, count two must be dismissed as multiplicitous.

25  / / /

26  / / /

27  / / /

28

08CR1197-LAB

**III.**

**THIS COURT SHOULD DISMISS COUNT TWO BECAUSE 18 U.S.C. § 1028A (THE IDENTITY THEFT PENALTY ENHANCEMENT ACT) DOES NOT APPLY TO FOREIGN NATIONALS.**

The government's theory of the broad sweep of § 1028A cannot be the law or what Congress intended. Section 1028A(a)(1) does not apply to Mr. Miloudi's alleged conduct because: (1) Congress did not intend for § 1028A(a)(1) to protect the identities of foreign citizens outside of U.S. jurisdiction; (2) Congress only intended for § 1028A(a)(1) to protect actual, aggravated identity theft; and at the current time there is no allegation that "Emilio Sanchez-Rivera" actually exists, or, if he does exist, is a United States Citizen.

**A.      The Identity Theft Penalty Enhancement Act of 2004**

Identity theft is commonly recognized as "one of the fastest growing crimes in the nation." See, e.g., Stephen F. Miller[1], Someone Out There is Using Your Name: A Basic Primer of Federal Identity Theft Law, 50 Fed. Law. 11 (Jan. 2003). Congress passed the Identity Theft Penalty Enhancement Act after finding that "almost 10 million ***Americans*** were the victims of some form of identity theft within the past year. . . ." H.R. Rep. 108-528, 2004 U.S.C.C.A.N. 779, p.4 (hereinafter H.R. Rep.) (emphasis added). Congress intended the Act, enacted on July 15, 2004, and codified as 18 U.S.C. § 1028A, "to reduce the incidence of identity theft and fraud and address the most serious criminals by providing stronger penalties for those who would commit such crimes in furtherance of other more serious crimes." Id. at p.9.

Subsection (a) of the statute provides that when identity theft is committed in the course of certain felonies, the defendant is subject to an enhanced penalty. For purposes of this motion, the relevant portion of § 1028A states:

> Whoever, during and in relation to any felony violation enumerated in subsection (c), ***knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person*** shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1) (emphasis added). The two-year term of imprisonment mandated by § 1028A may

---

[1] Mr. Miller is currently an Assistant United States Attorney employed in the Southern District of California.

08CR1197-LAB

1  not be suspended and may not run concurrently with any other term of imprisonment, including that

2  imposed for the underlying felony charged in count one of the indictment. See id. § 1028A(b). Count one,

3  § 1546, of the indictment constitute predicate offenses listed in § 1028A(c)(7).

4  **B.    Congress Did Not Intend § 1028A(a)(1) to Reach Conduct of the Type Alleged by the Government**

5  
6       **1.    *Congress intended for § 1028A(a)(1) to protect the identities of specific, actual, domestic persons, not foreign citizens in foreign countries.***

7       The government cannot maintain its § 1028A charge against "the 'commonsense notion that

8  Congress generally legislates with domestic [not foreign] concerns in mind.'" Small v. United States, 544

9  U.S. 385, 388-89 (2005) (quoting Smith v. United States, 507 U.S. 197, 204, n. 5 (1993)). For example, "a

10  legislature that uses the statutory phrase 'any person' may or may not mean to include 'persons' outside 'the

11  jurisdiction of the state.'" Small at 389. (quoting United States v. Palmer, 3 Wheat. 610, 631 (1818)

12  (Marshall, C.J.) (some internal quote marks omitted). The Supreme Court and the Ninth Circuit "have

13  adhered to the longstanding principle of American law that legislation is presumed to apply only within the

14  territorial jurisdiction of the United States unless the contrary affirmative intention of Congress is clearly

15  expressed." Arc Ecology v. United States Dep't of the Air Force, 411 F.3d 1092, 1097 (9th Cir. 2005). This

16  Court "must assume that Congress" created § 1028A "with knowledge of the presumption that a statute 'is

17  primarily concerned with domestic conditions.'" Id. (quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244,

18  248 (1991)). Further, this Court "***must*** resolve ***restrictively*** any doubts concerning the extraterritorial

19  application of a statute." Arc Ecology, at 1097 (emphasis added) (citing Smith, 507 U.S. at 204).

20       Although the presumption against extraterritoriality may be overcome by "clear evidence" of the

21  congressional intent to apply a statute extraterritorially, Smith, 507 U.S. at 204, here there simply is ***no***

22  evidence, let alone "clear evidence," that Congress intended to protect Mexican nationals from "aggravated

23  identity theft." On the contrary, as the government must concede, the intent of Congress is clear: to protect

24  ***Americans*** from having their identities stolen. The legislative history of § 1028A shows that Congress was

25  responding to the threat to ***American*** identities, and intended the Identity Theft Penalty Enhancement Act

26  to protect identities of persons ***within the United States' jurisdiction***. There is no evidence whatsoever that

27  Congress intended § 1028A to protect the identities of foreign citizens outside the jurisdiction of the United

28  

08CR1197-LAB

States. In passing the Act, Congress expressed concern that "almost 10 million *Americans* were the victims of some form of identity theft within the last year." H.R. Rep. at 4 (emphasis added). Congress listed several examples of persons who had committed identity theft, and every single example involved stolen identities of persons within the United States; most of the thieves stole American Social Security numbers. H.R. Rep. at 5-6. The author and sponsor of the Act, Congressman John Carter of Texas, testified as follows:

> [The Act] addresses the improper receipt [of] Social Security, Medicare, disability, veterans and other benefits [and] misuse of illegally obtained Social Security numbers. We have a responsibility to protect *the benefit programs of the Social Security Administration* from these identity thieves.
> This legislation also addresses a prevalent mode of identity theft which is committed by insiders of organizations who illegally use or transfer individuals' identifying information which has been entrusted to them. This is an increasing problem which we must protect *all our consumers* from.

150 Cong. Rec. H4808-01, H4810 (June 23, 2004) (remarks of Rep. Carter) (emphasis added).

The wave of thefts that spurred Congress to pass legislation like the Identity Theft Penalty Enhancement Act were thefts of the identities of Americans. "Identity theft is one of the fastest growing crimes *in the nation*," because "a growing legion of *Americans* . . . have become victims of the crime of identity theft." Miller, 50 Fed. Law. at 11 (emphasis added). According to Mr. Miller, Americans must protect their credit cards because "[i]n modern *American* society, the magnetic strip on the back of the credit card is the primary means of communicating between the bank and the merchant." Id. at 12 (emphasis added). Americans must also protect their social security numbers because "[a]ll *Americans* need Social Security numbers in order to function in society. The Social Security number is the basis of an *American* worker's lifelong employment history." Id. at 13 (emphasis added). Identity theft is a danger "[f]or *Americans* who become the victims of the insidious crime," and "there are precautions that all *Americans* should take." Id. at 14 (emphasis added). Mr. Miller's article argues that American "Lives Are Being Destroyed" by identity thieves. Id. at 12.

It is absurd to suggest that Congress intended the Identity Theft Penalty Enhancement Act to protect Mexican citizens. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." Griffin v. Oceanic

08CR1197-LAB

1  Contractors, 458 U.S. 564, 575 (1982).  There is no need to interpret § 1028A as having a sweeping global

2  reach and protecting the identity of the over six billion foreign citizens around the world — a truly absurd

3  result — when an entirely logical and consistent interpretation is that § 1028A(a)(1) protects the identities

4  of Americans.  This Court should interpret § 1028A(a)(1) to provide an enhanced sentence only when a

5  defendant uses the means of identification of an American resident.  Because count two references an

6  individual assumed to be a Mexican citizen, Emilio Sanchez Rivera, that count fails to state an offense under

7  § 1028A and must thus be dismissed.

8           **2.       *Congress intended for § 1028A(a)(1) to punish only true identity theft.***

9           According to Mr. Miller, once an "identity thief" steals "a victim's personal identifying

10  information . . . the thief assumes the victim's identity, purchases merchandise, signs contracts, and engages

11  in business, posing all the while as the victim."  Miller, Fed. Law.  50 Fed. Law. at 11.  Thus, true identity

12  theft occurs when "the thief assumes the victim's identity, purchases merchandise, signs contracts, and

13  engages in business, posing all the while as the victim."  Id. The impact of true identity theft "can be

14  devastating," because the victim suffers economic loss and other hardship by trying to reclaim his or her

15  identity.  Id. at 12.

16          The legislative history of § 1028A shows that Congress was concerned with the economic effects

17  of identity theft.  It found in 2004, that since September 11, 2001, identity theft has cost ***American***

18  businesses 47 billion dollars and individual ***American*** consumers 5 billion dollars.  H.R. Rep. at p.4.

19  Section 1028A was enacted to create "enhanced penalties for persons who ***steal identities*** to commit terrorist

20  acts, immigration violations, firearms offenses, and other serious crimes."  H.R. Rep. at 3 (emphasis added).

21  The Act was intended to "allow prosecutors to identify identity thieves ***who steal an identity***, sometimes

22  hundred[s] or even thousands of identities, for purposes of committing one or more crimes."  150 Cong. Rec.

23  H4808-01, H4809 (June 23, 2004) (statement of Rep. Sensenbrenner) (emphasis added).  "Section 1028A

24  would define a class of aggravated identity theft that includes ***the most serious and harmful form*** of this

25  pernicious practice."  *Identity Theft Investigation and Penalties: Hearing Before the Subcomm. on Crime,*

26  *Terrorism, and Homeland Security of the House Committee on the Judiciary*, 108th Cong. (March 23, 2003)

27

28

6

(statement of Timothy Coleman, Counsel to the Assistant Attorney General, Criminal Division) (emphasis added).

The title and heading of § 1028A also shows that Congress intended to punish only truly aggravated identity theft. "[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998) (quoting Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528-529 (1947) (internal quotation marks omitted); see also INS v. National Ctr. for Immigrants' Rights, 502 U.S. 183, 189 (1991); Prestige Ltd. Parternership-Concord v. East Bay Car Wash Partners, 164 F.3d 1214, 1215 (9th Cir. 1999). Clearly, an act entitled "The Identity Theft Penalty Enhancement Act" was intended to provide enhanced penalties for the theft of actual identities, not for an amalgamation of information among which was the name and information of a Mexican citizen. Moreover, the heading of § 1028A — "Aggravated identity theft" — shows Congress intended the Act to apply to a subset of identity theft crimes, i.e., those of an "aggravated" nature.

Congress did not intend for § 1028A's two-year-mandatory-consecutive-sentencing enhancement to apply to *foreign* nationals. On the contrary, Congress expressed its intent to differentiate people who commit "aggravated" identity theft of *American* identities and require a two-year-mandatory-minimum-consecutive prison term for those persons only. Because Congress did not intend for § 1028A to reach conduct such as that alleged by the government in this case, count two of the indictment must be dismissed. See Fed. R. Crim. P. 12(b)(3)(B).

**IV.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE THIS COURT'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. MILOUDI OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

The indictment in the instant case was returned by the January 2007 grand jury. See CR at 8.[2] That grand jury was instructed by this Court on January 11, 2007. See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached as Exhibit A. This Court's instructions

---

[2] "CR" refers to the Clerk's Record in Case Number 08CR1197-LAB .

08CR1197-LAB

to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[3]  These instructions compounded this Court's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  <u>See</u> Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B..  The indictment should be dismissed because the grand jurors were first instructed that their singular duty was to determine whether or not probable cause exists and that they had no right to decline to indict when the probable cause standard is satisfied.  Second,  grand jurors were instructed of a non-existent prosecutorial duty to present exculpatory evidence.

Mr. Miloudi's arguments are essentially those set out in Judge Hawkins' dissent in <u>United States v. Marcucci</u>, 299 F.3d 1156 (9th Cir. 2002), <u>cert. denied</u>, 1538 U.S. 934 (2003), Judge Kozinski's dissent in <u>United States v. Navarro-Vargas</u>, 367 F.3d 896 (9th Cir. 2004), <u>opinion</u> <u>vacated</u> <u>by</u> <u>United States v. Navarro-Vargas</u>, 367 F.3d 920 (9th Cir. 2004), and Judge Hawkins' dissent in <u>United States v. Navarro-Vargas</u>, 408 F.3d 1184 (9th Cir. 2005) (en banc) <u>cert. denied</u>, <u>Navarro-Vargas v. United States</u>, 546 U.S. 1036 (2005).  Mr. Miloudi incorporates those arguments by reference.  However, if the Court would like further briefing on this issue, Mr. Miloudi is happy to provide it.

## V.

## <u>MOTION TO COMPEL PRODUCTION GRAND JURY TRANSCRIPTS</u>

Mr. Miloudi moves to dismiss the indictment due to the various errors committed in the course of impaneling and instructing the January 2007 grand jury.  One of his challenges raises this court's misstatements regarding the prosecutors' duty to present evidence to the grand jury that "cuts against what they may be asking [the grand jurors] to do."  <u>See</u> Ex. A at 20.

Judge Moskowitz recently ruled on a motion similar to that filed by Mr. Miloudi  <u>See</u> <u>United States v. Martinez-Covarrubias</u>, Case No. 07cr0491-BTM, Order Denying Defendant's Motion to Dismiss the

---

[3]<u>See</u>, <u>e.g.</u>, <u>United States v. Cortez-Rivera</u>, 454 F.3d 1038 (9th Cir. 2006); <u>United States v. Navarro-Vargas</u>, 408 F.3d 1184 (9th Cir.) (<u>en banc</u>), cert. denied, 126 S. Ct. 736 (2005) (<u>Navarro-Vargas II</u>); <u>United States v. Navarro-Vargas</u>, 367 F.3d 896 (9th Cir. 2004)(<u>Navarro-Vargas I</u>); <u>United States v. Marcucci</u>, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

08<small>CR</small>1197-LAB

1  Indictment, dated October 11, 2007 (Exhibit C, hereinafter "Order"). Judge Moskowitz did recognize that

2  the instruction cited above is error, although he incorrectly found that it was not structural. <u>See</u> Order at

3  11. Because, under the analysis proposed by Judge Moskowitz's order, this Court must determine whether

4  the error was harmless, Mr. Miloudi files the instant motion to produce the transcripts of the grand jury

5  proceedings that resulted in the instant indictment.

6  **A.    <u>Relevant Facts</u>**

7          Discovery provided by the government that was in their possession at the time of indictment contains

8  exculpatory information. Specifically, a report of investigation dated February 19, 2008, recounts the contact

9  the Immigration and Customs ("ICE") Officers made with the Mexican Consulate to determine whether or

10  not Emlio Sanchez-Rivera is a Mexican National. <u>See</u> Exhibit D (Report of Investigation). They also

11  requested that the Mexican Consulate interview Mr. Sanchez. <u>See</u> id. No further documentation was

12  provided indicating what the results of the investigation were, if there were any results.

13          This information is relevant and exculpatory for on two levels. The first indicates that the "Emilio

14  Sanchez-Rivera" Mr. Miloudi is alleged to have assumed the identity of to procure the alien employement

15  identification card is not an individual known to the ICE Officers as residing within the United States,

16  otherwise they would not have reached out to the Mexican consulate for help in locating and interviewing

17  him. Secondly, it indicates that the ICE Officers were unsure of whether the individual actually existed as

18  they needed the Mexican Consulate's assistance in identifying him as being a Mexican National.   Simply

19  put, the government's own investigation report demonstrates that they do not know who "Emilio Sanchez-

20  Rivera" is and whether or not he actually exists. Where an indictment is issued on a charge that is

21  predicated on the existence of "Emilio Sanchez-Rivera" to sustain the claim, and a lack of knowledge of

22  whether he truly exists is affirmatively negated by the government's evidence and discovery, the legitimacy

23  of the grand jury proceedings are seriously called into question.

24  **B.    <u>The Court Should Order Production of the Grand Jury Transcripts.</u>**

25          The Court may order disclosure of grand jury proceedings "at the request of a defendant who shows

26  that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."

27  Fed. R. Crim. P. 6(e)(3)(E)(ii). The Ninth Circuit requires a "particularized need" to justify disclosure, <u>see</u>

28

08CR1197-LAB

1  United States v. Walczak, 785 F.2d 852, 857 (9th Cir. 1986), but that need cannot be any different than the

2  standard set forth in Rule 6(e)(3)(E)(ii): Mr. Miloudi needs to show that "a ground *may* exist to dismiss the

3  indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii)

4  (emphasis added). That is why the Rule's "general suggestion [is] in favor of disclosure." See Walczak,

5  785 F.2d at 857. Here, under Judge Moskowtiz's approach to this Court's erroneous instruction, it is clear

6  that, at the very least, "a ground *may* exist to dismiss the indictment because of a matter that occurred before

7  the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added).

8      First, it is apparent that a ground *does* exist to dismiss the indictment: the grand jury found probable

9  cause on a count that the government's evidence affirmatively negates. Second, however, this Court

10  instructed the grand jury that the prosecutor would disclose exculpatory evidence, because she was duty-

11  bound to do so. This instruction, when combined with an actual failure to disclose exculpatory evidence,

12  is extremely prejudicial to the grand jury's role as "gatekeeper." Failure to disclose exculpatory evidence

13  to a grand jury so instructed would be grounds to dismiss the indictment.

14      This Court instructed the grand jury that "in most instances, the U.S. Attorneys are duty-bound to

15  present evidence that cuts against what they may be asking you to do if they're aware of that evidence."

16  Ex. A at 20. According to Judge Moskowitz, "if Defendant can establish that the Government in fact knew

17  of exculpatory evidence that was not presented to the grand jury and that this failure to present exculpatory

18  evidence, in conjunction with Judge Burns' comments, 'substantially influenced the grand jury's decision

19  to indict' or raises 'grave doubt' that the decision to indict was free of the substantial influence of such

20  events, the Court may dismiss the indictment under its supervisory powers." See Order at 11-12, citing

21  Bank of Nova Scotia v. United States, 487 U.S. 250 (1988). Because Judge Moskowitz assigned the burden

22  of proving that to the defendant there, Martinez-Covarrubias, he granted Mr. Martinez-Covarrubias "leave

23  to conduct discovery regarding what evidence was presented to the grand jury." See id. at 12. This Court

24  should do the same here.

25      The court has more reason to do so here because, in fact, the Government had exculpatory

26  information in its possession at the time of indictment. The Martinez-Covarrubias Order cites no

27  exculpatory information. See Order. Here, in contrast, according to its own discovery, the government had

28

no affirmative knowledge that "Emilio Sanchez-Rivera" was in fact an actual person whose identity could be assumed by Mr. Miloudi.  See Ex. D.

That evidence is exculpatory because the crux of Mr. Miloudi's alleged offenses require that he in some manner assumed the identification of another person.  If the person in actuality does not exist, then the indictment cannot stand.

Because on its face, a ground exists to dismiss the indictment, the court should order that the transcripts be produced to defense counsel.  Because the "particularized need" standard, see Walczak, 785 F.2d at 857, requires only a showing "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury," Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added), and because the Rule's "general suggestion [is] in favor of disclosure," see Walczak, 785 F.2d at 857, this Court should order disclosure in order to permit Mr. Miloudi to meet his burden under Judge Moskowitz's approach. See Order at 12.

## VI.

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT VIOLATED MR. MILOUDI'S DUE PROCESS RIGHTS BECAUSE THEY CONCEALED THE CRIMINAL INVESTIGATION BY USING AN ADMINISTRATIVE IMMIGRATION PROCEEDING, THUS ABUSING THE INVESTIGATIVE PROCESS**

**A.    Relevant Facts**

On January 9, 2008, and predicated on information provided by unidentified sources that Mr. Miloudi was not Mexican but Moroccan or Algerian and working in the United States with documentation in the name of "Emilio Sanchez-Rivera." ICE agents went to his home to investigate his immigration status.  While at his home, the agents stated that they requested immigration documents and determined that the work  permit for Emilio Sanchez-Rivera had expired and was no longer valid.  As a result, the agents placed Mr. Miloudi under arrest.  At that time, they did not inform him of their suspicions about his identity.  After detaining him, he was informed that he was being arrested for an immigration violation but that Miranda rights would not be given because he was being held for an administrative proceeding. During this interview, Mr. Miloudi repeatedly requested that an attorney be present and refused

08CR1197-LAB

to answer questions without the presence of an attorney. He was told that his right to have an attorney present did not apply as he was being charged administratively.

During the intervening months, ICE agents continued their investigatory inquiries including requesting investigation by the Join Terrorism Task Force, reviewing medical records at Scripps Memorial Hospital, and contacting both the French and Mexican governments to investigate the identities of Mohammed Miloudi and Emilio Sanchez-Rivera. While he was in immigration proceedings, it is alleged that Mr. Miloudi began the process of filling out various forms to request relief from deportation containing information the government might not have otherwise had privvy to.

On March 6, 2008, following an immigration proceeding, it is alleged that Mr. Miloudi admitted that his name was not Emilio Sanchez-Rivera but was in fact Mohammed Miloudi and requested removal to France. Until the date of his removal proceeding, there had been no admission made by Mr. Miloudi as to his identity. A criminal complaint was not filed in this case until April 2008, well after the conclusion of the immigration proceedings where Mr. Miloudi admitted under oath his name and country of origin.

**B.    The government affirmatively misrepresented to Mr. Miloudi the existence of a criminal investigation.**

Throughout the course of the civil investigation, Mr. Miloudi believed that the focus of the investigation was solely for purposes of immigration enforcement. Nothing in the preceding months of the investigation signaled to Mr. Miloudi that the government had begun building a case against him as a target of a criminal identity theft investigation. In fact, until his admission before the court on the last day of his immigration proceeding, all court documents had been entered under the name of "Emilio Sanchez-Rivera." Had Mr. Miloudi been aware of the criminal investigation proceedings, he would have not have provided the evidence, namely his admissions before the immigration court, that could be used against him in the criminal prosecution.

The strategy to conceal the criminal investigation from Mr. Miloudi was an abuse of the investigative process. The government intentionally shielded its intentions behind the guise of an administrative immigration prosecution, resorting to subterfuge to maintain the secrecy of its involvement. By hiding behind the administrative immigration investigation to obtain evidence, avoid criminal discovery

08CR1197-LAB

1  rules, and avoid constitutional protections -- such as the <u>Miranda</u> rights Mr. Miloudi attempted repeatedly

2  to invoke but was told did not apply to him because it was an immigration proceeding -- the government

3  abused Mr. Miloudi's Fifth Amendment rights. <u>See</u> <u>United States v. Rodman</u>, 519 F.2d 1058 (1st Cir. 1973)

4  (holding that fairness to defendant required dismissal of indictment on misrepresentation and failure to

5  inform him that civil investigation actively contemplated a criminal referral). As a result of the

6  government's abuses, both Mr. Miloudi's Fifth Amendment rights against self-incrimination and due

7  process rights were eviscerated, and his ability to obtain a fair trial was permanently compromised because

8  of his admissions before the immigration court, thus requiring a dismissal of the indictment. <u>See, e.g.,</u>

9  <u>United States v. Blocker</u>, 104 F.3d 720, 728 (5th Cir.1997); <u>SEC v. ESM Gov't Sec., Inc.</u>, 645 F.2d 310,

10  315-16 (5th Cir.1981); <u>United States v. Mahaffy</u>, 446 F.Supp.2d 115, 124 (E.D.N.Y.2006); <u>United States</u>

11  <u>v. Schroder</u>, 2006 WL 3717896, at *3 (S.D.Ala.2006); <u>United States v. Stringer</u>, 408 F.Supp.2d 1083, 1087

12  (D.Or.2006); <u>United States v. Scrushy</u>, 366 F.Supp.2d 1134, 1138 (N.D.Ala.2005); <u>United States v. Teyibo</u>,

13  877 F.Supp. 846, 855-56 (S.D.N.Y.1995); <u>United States v. Parrott</u>, 248 F.Supp. 196, 200 (D.D.C.1965).

14      In a variety of contexts, other courts have recognized the importance of demarcating the distinction

15  between civil and criminal investigations. For instance, in <u>United States v. Grunewald</u>, 987 F.2d 531, 534

16  (8th Cir. 1993), the Eighth Circuit warned against deliberately engaging citizens in an ostensibly civil tax

17  investigation while they are, in fact, unknowingly being investigated for criminal conduct: "It would be a

18  flagrant disregard of individuals' rights to deliberately deceive, or even lull taxpayers into incriminating

19  themselves during an audit when activities of an obviously criminal nature are under investigation."

20  Similarly, in <u>Posada Carriles</u>, the court found an abuse of due process requiring dismissal where under the

21  guise of an immigration proceeding "the Government engaged in fraud, deceit, and trickery when it

22  misrepresented to Defendant that the purpose of asking him such extensive questions about his means of

23  entry into the United States, his conduct in Panama and Venezuela, and his use of various aliases and

24  passports was merely to 'clarify the record' [before the immigration court]." <u>United States v. Posada</u>

25  <u>Carriles</u>, 486 F.Supp.2d 599 (W.D.Tex. 2007).

26      Here, the indictment must be dismissed because the government chose to conceal the criminal

27  investigation in an effort to obtain admissions by Mr. Miloudi that he was unwilling to make otherwise.As

28

08CR1197-LAB

a result, the government violated his due process rights by abusing the investigative process by "intentionally shield[ing] its intentions behind the guise of a civil prosecution." <u>See, e.g.</u>, <u>SEC v. Dresser Industries, Inc.</u>, 628 F.2d 1368, 1377-78 (D.C. Cir. 1980)(parallel investigations improper if the nature of the proceedings demonstrably prejudice the substantial rights of the investigated party or of the government.).

## VII.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Miloudi respectfully requests that the Court grant the above motions.

Respectfully submitted,


*s/ Candis Mitchell*

Dated: May 22, 2008                    **CANDIS MITCHELL**
                                        Federal Defenders of San Diego, Inc.
                                        Attorneys for Mr. Miloudi
                                        Candis_Mitchell@fd.org

08CR1197-LAB